# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

|                                    |   |                      |
|------------------------------------|---|----------------------|
| STACY A. NABER,                    | : |                      |
|                                    | : |                      |
| Plaintiff,                         | : |                      |
|                                    | : |                      |
| v.                                 | : | C. A. 09-946-MPT     |
|                                    | : |                      |
| DOVER HEALTHCARE ASSOCIATES, INC., | : |                      |
|                                    | : |                      |
| Defendant.                         | : |                      |

## <u>MEMORANDUM ORDER</u>

## I.    INTRODUCTION

This is an employment discrimination case.  On December 9, 2009, Stacy A. Naber ("Naber") filed suit against Dover Healthcare Associates, Inc., d/b/a Silver Lake Center ("Silver Lake") alleging violations of the Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq.* ("FMLA") and the Americans With Disabilities Act, 42 U.S.C. § 12101, *et seq.* ("ADA").[1]  Currently before the court is Silver Lake's motion for summary judgment.[2]

## II.    BACKGROUND

Silver Lake is a 120-bed nursing home facility located in Dover, Delaware that provides skilled nursing, medical, and rehabilitative care for patients and older adults

---

[1] D.I. 1 (Complaint).  Plaintiff avers that she timely submitted a complaint of discrimination on the basis of disability to the Delaware Department of Labor and the Equal Employment Opportunity Commission ("EEOC"); that she received a Notice of Right to Sue for that charge from the EEOC; and, that she timely filed her complaint in this action within ninety days of her receipt of the Notice of Right to Sue.  *Id.* at ¶¶ 7-9.

[2] D.I. 32 (Defendant's Motion for Summary Judgment).  On March 10, 2010, the parties consented, pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, to the jurisdiction of United States Magistrate Judge Mary Pat Thynge to conduct all proceedings and order the entry of a final judgment in this matter.  *See* D.I. 9.

who live there ("residents").[3]  In order to provide regular mental and physical stimulation

to bolster the health and well being of its residents, Silver Lake created treatment plans

that include daily group and individual activity sessions.[4]  Group activities include coffee

socials, bible study, games, and exercises.[5]  Recreation Assistants conduct those

activities.

Recreation Assistants document each resident's participation in activity log

books.[6]  According to Silver Lake, because the facility reports treatment to Medicaid and

Medicare for reimbursement purposes, accurate documentation of resident activities is

of the utmost importance.[7]  Consequently, Silver Lake's policies provide that falsifying

residents' records is grounds for immediate termination.[8]

Naber was hired by Silver Lake on August 20, 2007 as a Recreation Assistant.[9]

During her employment, plaintiff's supervisor was Erin Mueller ("Mueller"), the Director

of Recreation.[10]  Early in her employment, Naber erroneously documented that she had

a one-on-one room visit with a particular resident when, in fact, she had visited a

---

[3] D.I. 33 at 2 (Defendant's Opening Brief in Support of Its Motion for Summary Judgment).

[4] *Id.*

[5] D.I. 35, Ex. A (Naber Deposition Tr.) at 52:15-19, 59:21-61:13.

[6] *Id.*, Ex. A at 47:24-48:19.

[7] D.I. 33 at 2; *see also* D.I. 35, Ex. B (Employee Handbook–July 2008) at DOVER0000249 ("We are . . . responsible for the lives of those in our care and for the safety of our employees.  We are accountable to many federal, state and local regulatory agencies.  To meet our obligations and to create a safe and respectful environment for everyone, we have established a set of conduct, performance and attendance standards based on the values of our organization, best practices for good patient care and legal requirements.").

[8] D.I. 35, Ex. B at DOVER0000251, #18 (listing under the heading "Group C:  Grounds for Immediate Dismissal," "1st Offense:  Termination of Employment," "Being dishonest including, but not limited to, deception, fraud, lying, cheating, theft or *falsification of records* to include patient medical records, employment documents . . . or financial documents") (emphasis added); *id.*, Ex. A at 326:18-23 (Naber acknowledged knowing that, according to company policy, termination was the appropriate discipline for the falsification of records.).

[9] D.I. 1 at ¶ 14; D.I. 35, Ex. A at 21:13-18.

[10] D.I. 35, Ex. C (Plaintiff's Answers to Defendant's Request for Admissions) at No. 4.

different resident.  Mueller noticed the error and, when asked about it, Naber acknowledged her mistake.  Mueller responded that such mistakes happen and that Naber should be more careful.[11]

Naber initially had a cordial relationship with Mueller, but sometime in 2008 their relationship changed.[12]  That change was a result of Naber's belief that Mueller made inappropriate comments, and/or started rumors, about Naber to other Silver Lake employees.[13]  Those comments/rumors included:  something to the effect of "there goes Stacy with her man laugh" (suggesting that Naber frequently flirted with men); that Naber dressed provocatively; that Naber would date anyone; that Naber was pregnant; and, that Naber was having a relationship with a co-worker.[14]

Sometime in 2008, Naber spoke to Human Resources representative Theresa Maloney ("Maloney") about Mueller's gossiping, after which, Maloney relayed Naber's concerns to James Adams ("Adams"), Silver Lake's Nursing Home Administrator.[15] Maloney and Adams then met with Naber to discuss her concerns.  At the conclusion of the meeting, Adams said he would discuss the matter with Mueller.[16]  A meeting with

---

[11] D.I. 41 at B28-B29.

[12] D.I. 35, Ex. C at Nos. 7, 8; *id.*, Ex. A at 89:22-90:3, 99:4-8.

[13] *Id.*, Ex. C at No. 9; *id.*, Ex. A at 90:4-9.

[14] *Id.*, Ex. C at Nos. 10, 11; *id.*, Ex. A at 91:10-95:5, 99:12-101:23.  Naber testified that a co-worker, Shelly Shoup, told Naber that Mueller commented to Shoup about Naber's flirtatious "man laugh" and that Naber dressed provocatively.  Mueller also allegedly told Naber directly that she dressed provocatively.  *Id.*, Ex. A at 90:8–20, 91:10-94:13.  In addition to the alleged rumor that Naber was having a relationship with a co-worker, Naber testified that Mueller asked her why she was talking to that co-worker, what was going on between them, and if the two of them spent time together outside of work.  *Id.*, Ex. A at 99:14-100:24.  On the topic of rumors purportedly spread by Mueller about Naber, Silver Lake's Administrator James Adams, testified that Brian Ridgeway, Silver Lake's Director of Maintenance, reported to Adams that Mueller had told Ridgeway "that [Naber] was pregnant or had been pregnant or was pregnant or something to do with a pregnancy."  When Adams asked Mueller whether she knew anything about Naber being pregnant, Mueller told Adams that it was Ridgeway who had suggested to Mueller that Naber was pregnant.  D.I. 41 at B41.

[15] D.I. 35, Ex. A at 91:3-7, 96:16-98:5, 110:4-10.

[16] *Id.*, Ex. A at 110:12-112:23.

Maloney, Mueller, and Naber was then arranged.[17]  During the meeting, Maloney told

Mueller of Naber's concerns.  Mueller denied spreading rumors about Naber but

apologized for asking questions about her relationship with a co-worker.[18]

Naber also submitted an affidavit averring that at some point in 2008, she and

Shelly Shoup ("Shoup"), another Resident Assistant, requested to speak with Human

Resources concerning their difficulties with Mueller.[19]  According to Naber, when Adams

became aware of that request, he called the two into his office and told them "he was

tired of what was going on in the Recreation department, that he liked what Ms. Mueller

was doing in the Department, and that if we did not like it, we could look for other

jobs."[20]

In January 2009, Mueller took maternity leave for six weeks.[21]  Mueller's absence

increased the number of tasks Naber was required to complete while working the same

number of hours.  During Mueller's leave, Naber met with Human Resources Regional

Manager Janet Krauss ("Krauss") and complained that the increased workload

"stressed [her] out" and left her feeling "exhausted" and expressed her frustration with

Mueller because of the purported previous gossip about Naber.[22]

Shortly after Mueller returned from maternity leave on February 23, 2009, Naber

became anxious about going to work and felt as though she was "walking on pins and

---

[17] *Id.*, Ex. A at 102:17-23.
[18] *Id.*, Ex. A at 103:10-105:20.
[19] D.I. 41 at B50 (Affidavit of Stacy Naber).
[20] *Id.*  At deposition, Adams acknowledged that he widely praised Mueller's supervision of her department.  He did not recall a meeting with Shoup and Naber to discuss complaints about Mueller, but denied telling Shoup and/or Naber that he was tired of what was going on in the department or that they should look for other jobs if they were unhappy.  *Id.* at B40.
[21] D.I. 35, Ex. D (Mueller Deposition Tr.) at 5:2-8; *id.*, Ex. A at 136:6-25.
[22] *Id.*, Ex. A at 136:21-137:21, 152:18-154:9, 156:10-17.

needles," "being watched," and that Mueller was harassing her by "nitpicking" everything she did.[23]  That anxiety led to sleeplessness at least one or two nights a week.[24]

In a meeting on February 26, 2009, Naber told Mueller and Kendra Marvel ("Marvel"), Benefit/Payroll Designee, that she needed time off from work "to get away for a while."[25]  Naber also stated that she had spoken with June Leslie ("Leslie"), Assistant Recreation Director, about being burned out.  Leslie mentioned that, at the discretion of the director, Naber could potentially work a reduced schedule of thirty-two hours per week, in which Naber expressed interest.[26]  Mueller responded that since her return from maternity, Naber had not made this request.  Mueller also told Naber that rather than going to Human Resources, she should have come directly to Mueller with her request for time off.  Mueller also informed Naber that she would have to evaluate the needs of the department before determining whether Naber's request for a thirty-two hour week could be accommodated.[27]  On March 1, 2009, Naber submitted a "Time Off Request" form seeking leave from March 23 to March 26, 2009, which Mueller authorized.[28]

On March 3, 2009, Naber wore blue jeans to work.  Such attire is permitted at Silver Lake only on a "dress-down day."  Because that date was not a dress-down day, Mueller gave Naber a verbal warning, documented in a "Corrective Action Notice."[29]

---

[23] *Id.*, Ex. A at 134:6-20, 136:6-19, 182:23-184:16.

[24] *Id.*, Ex. A at 133:16-134:5.

[25] *Id.*, Ex. A at 158:22-159:2.

[26] D.I. 41 (Mueller Note re:  02/26/2009 meeting) at B1.

[27] *Id.*

[28] D.I. 35, Ex. A at 160:18-162:5; *id.*, Ex. E (Time Off Request).

[29] *Id.*, Ex. F (Corrective Action Notice); D.I. 41 at B33 (Mueller testified that she disciplined Naber "[b]ecause she reported to work in blue jeans, although it was not a dress-down day, and that was against our dress code, our dress policy.").  According to the facility's Employee Handbook, verbal counseling is the sanction for a first offense of "Disregarding the organization's dress code."  D.I. 35, Ex. B at

Naber felt that the discipline was unfair and complained to Mueller that other employees, including a department head, were wearing jeans that day. Naber also explained to Mueller she was wearing jeans because she had torn her uniform pants and did not have another clean pair.[30] Mueller acknowledged that, had Naber explained the situation to her upon arriving at work, likely no disciplinary action would have been taken.[31]

After being issued the disciplinary form, Naber contacted Betty Scott ("Scott"), Regional Vice President, to express her concern over how she was being treated.[32] Scott responded that she would ask Krauss to arrange a meeting with Naber, Krauss, Adams, Mueller.[33] That meeting took place on March 5, 2009.[34] At the meeting, Naber's write up for wearing jeans was discussed and Naber stated that she felt:

> that [the write up] was unfair and that I was getting written up, and I told [Mueller] that I fe[lt] like she's going to write me up for any little thing that she can find. So that's basically what our meeting was, to discuss the issues at hand with [Mueller], still ongoing issues, I guess is what you can say, ongoing issues between me and [Mueller].[35]

---

DOVER0000250, # 17. The Corrective Action Notice states, in the "Employee comments" section, that Naber refused to sign the notice and, when offered a copy, responded "I don't need it." *Id.*, Ex. F.

[30] D.I. 41 at B33-B34; D.I. 35, Ex. A at 167:7-24. Mueller testified that she did not recall seeing any other employees wearing jeans that day, but that none of her other supervised employees were wearing jeans. D.I. 41 at B33-B34. At deposition, Naber could only recall the name of one other employee wearing jeans that day, a manager of social services who was not supervised by Mueller. According to Naber, Adams informed her that he had written up that manager for wearing jeans. She also testified that she did not know whether or not other employees allegedly wearing jeans that day were disciplined. D.I. 45, Ex. A at 168:8-169:20. Adams testified that Mueller's discipline of Naber was appropriate as it was not a dress-down day and Naber's attire was, therefore, contrary to Silver Lake's policy. Adams also testified that the manager of social services who wore jeans that day reported directly to him. He issued her a verbal warning for noncompliance with the dress code and sent her home to change clothes. *Id.*, Ex. I at 36:17-37:17.

[31] D.I. 41 at B33.

[32] D.I. 35, Ex. A at 352:22-353:14.

[33] *Id.*, Ex. A at 353:15-354:3.

[34] *Id.*, Ex. A at 167:7-24, 353:24-354:3.

[35] *Id.*, Ex. A at 167:15-24.

Krauss told Naber that the disciplinary action was appropriate because Naber had not approached Mueller to explain why she was wearing jeans.[36] Naber testified that she was very upset and crying during the meeting and advised Krauss that she did not think she could return to work. Krauss told her she could go home and suggested Naber call the Employee Assistance Program ("EAP") to discuss her frustrations. Naber went home and called the EAP, returning to work the next day.[37] That day, March 6, 2009, Naber requested leave for the following week, March 9 to March 13, 2009. Despite having already scheduled Naber's shifts for that week, Mueller approved her leave request.[38]

On March 10, 2009, Naber requested intermittent FMLA leave.[39] An Initial Medical Certification, also dated March 10, 2009 and signed by Maryellen Carbaugh ("Carbaugh"), a Licenced Professional Counselor of Mental Health, diagnosed Naber with "Major Depression, Single Episode, Moderate" and listed "poor sleep, poor appetite, low mood, tearfulness, Stress at work due to hostile environment" as medical facts supporting Carbaugh's certification.[40] Carbaugh's notes from Naber's March 10, 2009 session state that the reason for counseling was "Personal & Work issues." The notes also record that Naber recounted being disciplined for wearing jeans at work despite other co-workers wearing jeans; that Naber felt her supervisor was harassing

---

[36] D.I. 41 at B5 (Plaintiff Note re: 03/05/2009 meeting).
[37] D.I. 35, Ex. A at 178:22-179:22, 309:23-312:10. According to Naber, Krauss told her that she seemed very angry during the meeting and that she should contact the EAP. *Id.*, Ex. A at 311:15-312:1; D.I. 41 at B5.
[38] D.I. 35, Ex. A at 163:19-166:7; *id.*, Ex. G (Time Off Request); D.I. 41 at B7.
[39] D.I. 35, Ex. A at 151:10-152:10; D.I. 36, Ex. H (Employee Request for Leave of Absence).
[40] D.I. 36, Ex. H.

her; and, that the resultant stress was starting to affect her life outside of work.[41] Carbaugh advised that Naber should be on a intermittent leave in order to attend weekly hour-long counseling sessions and twice-monthly medical appointments.[42]

After Naber submitted her request for FMLA leave, Marvel purportedly told her that Adams as not happy about the indication that Naber's stress was due to a hostile work environment and that Adams was going to contact Carbaugh to have that indication changed.[43] Adams testified that he had seen the hostile work environment notation when he signed the FMLA request form. He stated that, as an administrator, he was concerned by that notation and asked Marvel to contact Carbaugh to clarify the designation.[44] Adams adamantly denied ever asking for the "hostile work environment" notation to be removed.[45] Marvel submitted a declaration to the same effect in which she avers that Adams expressed concern about that notation and asked her to contact Carbaugh to "get a better understanding of what was meant by 'hostile work environment,'" but that Adams never requested that she ask Carbaugh "to change or in any way alter the certification or any statements on the certification."[46]

When Naber returned to work on March 15, 2009, she did not conduct a scheduled 4:00 p.m. "Sensations" activity session. Mueller, in a meeting also attended

---

[41] *Id.*, Ex. K.

[42] *Id.*, Ex. H.

[43] D.I. 41 at B25.

[44] *Id.* at B42-B43. Specifically, Adams testified as to the reason for his concern: "if there is workplace violence going on–when I see hostile work environment, I think of physical concern. It is my obligation and my duty to protect my residents and my other staff. And I asked for clarity on hostile work environment, if [Carbaugh] could clarify what it is that made her write . . . hostile work environment. That was a concern of mine." Marvel tried to contact Carbaugh for that clarification but her call was not returned. D.I. 45, Ex. I at 44:22-45:12.

[45] D.I. 45, Ex. I at 45:13-16 ("Q. Did you ever express to anyone that you would prefer that Ms. Carbaugh remove that statement from the certification? A. No, absolutely not; I know better than that.").

[46] *Id.*, Ex. 1 (Declaration of Kendra Marvel).

by Marvel, gave Naber a verbal warning, again documented by a Corrective Action Notice.  The document recorded that "on [the] weekend, all groups are [the] responsibility of [the] activity assistant on duty."[47]  Naber explained to Mueller that she was the only Recreation Assistant on duty that day and, after completing several other tasks, a resident who required someone to be with him asked to go outside to smoke at around 3:45 p.m.  Because that resident normally smoked two cigarettes, it was after 4:00 p.m. before she returned inside.[48]  After giving Mueller that explanation, Naber "started shaking and stated 'Erin you are driving me crazy, I can't deal with this, [and] started to cry . . . .'"  Mueller responded that "[j]ust because you are on FMLA doesn't mean you are on light duty, you still have to do the work."[49]  Mueller also told plaintiff, that she was "being watched."[50]

On Sunday, March 29, 2009, Naber recorded on Resident A's[51] record that she had a one-on-one room visit with him.[52]  Resident A was a relatively new resident at Silver Lake and was one of approximately ten African-American male residents at the

---

[47] D.I. 41 at B11 (Corrective Action Notice); *id.* at B35 (Mueller testified that "I observed [Naber] not provide a Sensations activity which, as the sole recreation assistant scheduled for the weekends, was her responsibility.  And as a result of that, I presented her with a verbal . . . Corrective Action Notice for not fulfilling that part of her job.").

[48] *Id.* at B12 (Plaintiff Note); *id.* at B27-B28.

[49] *Id.* at B12; *id.* at B24.

[50] *Id.* at B24.

[51] The court follows Silver Lake's convention in its briefs of referring to Silver Lake residents by alphabetical designations to protect the privacy of those individuals.

[52] D.I. 36, Ex. J (Resident Participation Record for Resident A).  Mueller explained that residents have one-on-one sessions scheduled Monday through Friday.  Because it was Sunday, Naber was not required to do a one-on-one session with Resident A, or any other resident, that day.  Mueller had instructed the activities staff, however, that if they had time on Sundays, they could go ahead and conduct the sessions scheduled for Monday, in order to help the employees scheduled for the Monday shift.  This was merely a suggestion, not a mandatory part of the job description.  Mueller acknowledged that Naber was an hourly employee who was not paid anything extra for conducting individual Sunday sessions with residents and that Naber could have instead relaxed, read the paper, or watched television.  D.I. 41 at B36-B37.  Resident A's one-on-one session was scheduled for the next day, Monday.  *Id.* at B36.

facility.[53]  He was also nonverbal.[54]  Resident A had only recently been placed on the room visit list.[55]  Having not previously done a room visit with him, Naber did not know to which room Resident A was assigned.[56]  After checking the "bed board sheet," which indicates residents' room numbers and bed assignments, she proceeded to the room listed for Resident A and saw a nonverbal African-American individual and another long-time resident with whom she was familiar.[57]  Naber stated that the African-American gentleman acknowledged her by looking at her and smiling.  She then provided her room activity by reading to him.[58]  At the time, Naber was not familiar with Resident A and did not know he was African-American.  She assumed, however, that the individual to whom she read was the correct resident as he was sitting by the bed assigned to Resident A.[59]  On that date, however, Resident A was in the hospital, not at Silver Lake.[60]

On March 30, 2009, Shoup called Mueller's attention to Naber's documentation that she provided an activity for Resident A the previous day.[61]  Mueller informed Adams of the apparent documentation error.[62]  After reviewing the documentation, Adams

---

[53] D.I. 41 at B17, B30.

[54] *Id.* at B37; *id.* at B13 (Recreation Assessment form for Resident A, indicating "NONE OF THE ABOVE" to a list of "Modes of Expression," including "Speech"; "Writing messages to express or clarify needs"; "American sign language or Braille"; "Signs/gestures/sounds"; and "Communication board").

[55] *Id.* at B18 (Transcript of Hearing before the Division of Unemployment Insurance Appeals for the State of Delaware).

[56] *Id.* at B18-19; *id.* at B37.

[57] *Id.* at B19-B21.  A name plate for that room recorded the name of the resident she knew, but the name plate for the other resident of that room was blank.  *Id.* at B20.

[58] *Id.* at B21.

[59] D.I. 35, Ex. A at 293:23-294:8; D.I. 41 at B19 (testifying at her unemployment hearing that she had not previously done a room visit with Resident A and she was not very familiar with him).

[60] D.I. 35, Ex. D at 96:18-19; *id.*, Ex. I at 48:13-18.

[61] *Id.*, Ex. D at 96:9-97:12; *id.*, Ex. I at 47:12-48:18; D.I. 36, Ex. J.

[62] D.I. 35, Ex. I at 47:2-49:14.

instructed Mueller to look over other resident participation records from the previous day to determine whether Naber had inadvertently recorded an activity with a different resident. He also asked Mueller to speak to other residents with whom Naber recorded having one-on-one visits that day.[63]

Mueller spoke with two residents ("Resident B" and "Resident C") Naber documented as having visited on March 29 who Mueller believed were cognitively aware enough to remember if they had interacted with Naber the previous day.[64] One of the residents told Mueller she had seen Naber in the hallway, but that Naber had not entered her room, while the other resident said the only person who visited her the day before was the resident's daughter.[65] Mueller informed Adams of the residents' responses.[66] Adams then contacted Krauss and explained the situation to get her advice.[67] Krauss recommended that Mueller obtain signed statements from the residents recording their responses, which she did the next day, March 31, 2009.[68]

On that date, Krauss and Adams met with Naber to discuss the activity logs for

---

[63] *Id.*, Ex. D at 98:10-23; D.I. 41 at B44.

[64] D.I. 35, Ex. D at 98:17-23. Realizing that not all of the residents Naber documented as visiting were able to communicate, Adams instructed Mueller to interview verbal, communicative, residents. D.I. 41 at B44. At her unemployment hearing, Naber opined that Residents B and C were both cognitively impaired. D.I. 41 at B18.

[65] D.I. 35, Ex. D at 98:24-99:8.

[66] *Id.*, Ex. D at 99:9-17; *id.*, Ex. I at 52:8-53:1.

[67] *Id.*, Ex. I at 53:2-8.

[68] *Id.*, Ex. D 101:11-21; *id.*, Ex. I at 53:9-23. According one statement documented by Mueller, the resident said that "[Naber] did not play balloon[, the activity Naber documented,] on Sunday. [The resident] said she saw [Naber] in the hallway pushing others, but [Naber] didn't come in and play balloon." Below that written statement is a line on which an illegible signature is scrawled. The document was, however, dated March 31, 2009; records that resident's name; includes the notation "Interview and transcription by: Erin Mueller, Recreation Director" (with her signature); and, includes the signature of a Labor Management Coordinator as a witness. D.I. 41 at B14. Mueller testified that the witness was a manager from another department and explained that the resident was unable to legibly sign her name due to severe arthritis, and other physical issues, but was able to carry on a conversation with Mueller. D.I. 35, Ex. D at 101:2-10.

Residents A, B, and C.[69]  Adams asked Naber to describe her March 29 interactions

with those residents and to describe each resident, their rooms, and their roommates,

which she did.[70]  After Naber described Resident A and his roommate, Adams informed

her that Resident A was not at Silver Lake on March 29; he was in the hospital on that

date.[71]  Naber testified that she might have responded that "he must have c[o]me back

then" but, nevertheless, repeatedly insisted that "I know I saw somebody."[72]  Adams

then informed Naber that falsely documenting activities performed for a resident was

grounds for termination.[73]  At some point during the discussion, Naber became

frustrated and upset and stated that she did not want to continue the discussion.[74]

Adams testified that he then told Naber that "if you are not willing to discuss anything

more about [Resident A], I'm going to have to put you on an unpaid administrative leave

until [Krauss] and I can talk about this a little further."[75]  Krauss then told Naber that if

there was any additional information she wanted to share with her, Naber should call

---

[69] D.I. 35, Ex. A at 291:22-293:14; *id.*, Ex. I at 54:3-55:22.

[70] *Id.*, Ex. A at 292:8-293:6; *id.*, Ex. I at 55:22-58:4.  During this discussion, Naber insisted "I know my residents."  *Id.*, Ex. I at 59:2-7; *id.*, Ex. A at 296:18-297:4 ("Q.  Do you remember telling Ms. Krauss that you knew who your residents were?  A.  Yeah, I believe so.  Q.  So when you were asked to describe them, you insisted that you knew who they were?  A.  I believe so, yes.  Q.  And that's what you told Ms. Krauss and Mr. Adams?  A.  I believe so.").  As noted above, however, Naber testified that she had not previously done a room visit with Resident A and was not familiar with that individual.  *Id.*, Ex. A at 293:23-294:8; D.I. 41 at B19.

[71] D.I. 35, Ex. A at 293:6-14; *id.*, Ex. I at 58:19-23, 60:1-2.

[72] *Id.*, Ex. A at 294:9-17; *id.*, Ex. A at 293:8–14; D.I. 41 at B31.

[73] D.I. 41 at B15 (Plaintiff Note re:  03/31/09 meeting).

[74] D.I. 35, Ex. I at 60:1-20; *id.* Ex. A at 294:22-24 ("I know I got quiet because I got frustrated, because I kept saying I know I saw him . . . .").

[75] *Id.*, Ex. I at 60:20-24; D.I. 41 at B15.  When asked during deposition if, during her meeting with Adams and Krauss, she suggested that the wrong individual was in Resident A's room she replied:  "A.  I didn't get the opportunity. . . .  Q.  At any point when you were walking out and [Adams] was there, did you say to him 'maybe it was the wrong person?'  A.  No.  Q.  Did you ever say that to [Adams] before you were terminated?  A.  No.  I didn't know.  I don't think I had the opportunity and . . . I don't know.  I was in such shock, I pretty much got slammed with this."  D.I. 35, Ex. A at 298:2-299:6.

and that they would, nevertheless, contact her the following day.[76]  Naber did not

contact Krauss or Adams with additional information and, following a call between

Adams and Krauss on April 1, 2009, Adams terminated Naber's employment for

"falsif[ying] a resident's Residential Participation Record and Individual Programming

Log."[77]

## III.  DISCUSSION

### A.  Standard on Motion for Summary Judgment

Under Rule 56(c) of the Federal Rules of Civil Procedure, a court is to enter

summary judgment only when the record demonstrates that there is no genuine issue

as to any material fact and that the movant is entitled to judgment as a matter of law.  In

deciding a motion for summary judgment, the court's role is not to weigh the evidence or

to determine the truth of the matters asserted, but to determine whether there is a

genuine issue of fact for trial.[78]  In so doing, the court must view all facts and draw all

reasonable inferences in favor of the non-movant, take as true all allegations of the

non-movant that conflict with those of the movant, and resolve all doubts against the

movant.[79]  The court must also treat direct and circumstantial evidence alike.[80]

### B.  The *McDonnell Douglas* Standard

---

[76] D.I. 35, Ex. I at 61:1-8.  Adams testified that "Krauss, when we left that–At the end, when I said to [Naber], I'm going to put you on paid administrative leave, then [Krauss] . . . said to [Naber]:  What you need to do is think about this . . . if there is anything else that you need to talk to me about or tell me about this situation, if you have any concerns, please give me a call.  You have my number.  We will be talking to you tomorrow."  D.I. 41 at B46.

[77] D.I. 41 at B46; D.I. 35, Ex. L (Defendant's Answers to Plaintiff's First Set of Interrogatories) at No. 16.

[78] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[79] *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Gans v. Mundy*, 762 F.2d 338, 341 (3d Cir. 1985).

[80] *See Desert Palace, Inc. v. Costa*, 539 U.S. 90, 94 (2003).

Naber's disability discrimination and retaliation claims are analyzed under the burden-shifting framework established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green.*[81] The *McDonnell Douglas* analysis consists of three stages. First, a plaintiff bears the initial burden of establishing a prima facie case of discrimination or retaliation.[82] If a prima facie case is set forth, the burden then shifts "to the employer to articulate some legitimate, nondiscriminatory reason" for the adverse employment action.[83] The burden then shifts back to the plaintiff to show that the employer's stated reason for the employment action was pretextual.[84]

## C.    FMLA Retaliation Claim

Naber alleges that Silver Lake fired her in retaliation for her attempt to exercise her rights under the FMLA.[85] FMLA retaliation claims are analyzed under the *McDonnell Douglas* burden-shifting framework.[86] To establish a prima facie case of FMLA retaliation, Naber must show: "(1) plaintiff availed herself of a protected right under the FMLA; (2) plaintiff suffered an adverse employment action; and (3) there was a causal connection between the employee's protected activity and the employer's adverse employment action."[87] "'After establishing a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its adverse

---

[81] 411 U.S. 792 (1973).
[82] *McDonnell Douglas*, 411 at 802.
[83] *Id.*
[84] *Id.* at 804.
[85] D.I. 1 at ¶ 28.
[86] *Schlifke v. Trans Would Entertainment Corp.*, 479 F. Supp. 2d 445, 451-52 (D. Del. 2007) ("Retaliation claims under the FMLA are analyzed under the burden shifting framework of *McDonnell Douglas* . . . .") (citing *Bearley v. Friendly Ice Cream Corp.*, 332 F. Supp. 2d 563, 571 (M.D. Pa. 2004) and *Baltuskonis v. U.S. Airways, Inc.*, 60 F. Supp. 2d 445, 448 (E.D. Pa. 1999)).
[87] *Schlifke*, 479 F. Supp. 2d at 452 (citing *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135 (3d Cir. 2004); *Bearley*, 322 F. Supp. 2d at 571; and *Baltuskonis*, 60 F. Supp. 2d at 448).

employment action.'"[88]  "'Finally, if a legitimate non-discriminatory reason is provided, the plaintiff must present evidence to show that the defendant's proffered reasons were not its true reasons, but were merely a pretext for its illegal action.'"[89]  "In order to survive summary judgment, a plaintiff must 'either (i) discredit[ ] the [defendant's] proffered reasons . . . , or (ii) adduc[e] evidence . . . that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.'"[90]

Silver Lake maintains that Naber fails to establish a prima facie case of FMLA retaliation because she cannot demonstrate a causal connection between her request for intermittent FMLA leave and her termination.  Silver Lake contends that Naber's only support for her FMLA retaliation claim is the timing of her FMLA request and her termination, as well as her own belief that she was subjected to retaliation.  Although "[a]t least *when it is particularly suggestive*, the temporal proximity of plaintiff's protected conduct and his termination can raise an inference that there is a causal link between the two,"[91] temporal proximity alone is generally insufficient to establish the required causal connection.[92]  Also, a plaintiff's belief that she was a victim of retaliation is

---

[88] *Id.* (quoting *Bearley*, 322 F. Supp. 2d at 571).

[89] *Id.* (quoting *Baltuskonis*, 60 F. Supp. 2d at 448).

[90] *Id.* (alterations in original) (quoting *Torre v. Casio, Inc.*, 42 F.3d 825, 830 (3d Cir. 1994) discussing *McDonnell Douglas* burden shifting in an Age Discrimination in Employment Act ("ADEA") case)); *see also Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994) (stating that to rebut a defendant's "legitimate, non-discriminatory reasons for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action"); *id.* (noting that the plaintiff does not have to prove that the illegitimate factor (i.e., discrimination or retaliation) "was the *sole* reason for the decision, but that the illegitimate factor was a *determinative* factor in the adverse employment decision") (emphasis in original) (citing *Hazen Paper Co. v. Biggins*, 507 U.S. 604 (1993)).

[91] *Burch v. WDAF AM/FM*, Civ. A. No. 00-4852, 2002 U.S. Dist. LEXIS 12290, at *33 (E.D. Pa. June 28, 2002) (emphasis added).

[92] *Schlifke*, 479 F. Supp. 2d at 452 ("[P]laintiff has failed to produce evidence to establish causation.  It is true that there is close temporal proximity between plaintiff's taking maternity leave and her termination.  However, *timing alone will not give rise to an inference of retaliation.*  The court must

similarly insufficient to satisfy her burden of proof.[93]  Silver Lake argues that even if temporal proximity alone was enough to establish a causal connection, Naber's purported falsification of Resident A's treatment record was an intervening event that broke the causal chain between Naber's alleged protected conduct and her termination.

Silver Lake thus concludes that Naber cannot establish a prima facie case of FMLA retaliation and summary judgement is warranted for this claim.

Naber does not base her argument solely on the close temporal proximity to her FMLA request and termination; she contends other evidence supports the causal connection.  First, relying on her deposition testimony relating a conversation with Marvel following her request for FMLA leave, she contends that Carbaugh's certification of her FMLA request, including "stress at work due to hostile environment" among the medical facts supporting the certification, upset Adams and that he intended to contact Carbaugh to convince her to change that statement.[94]  The court initially notes that Silver Lake maintains that Naber's statement concerning her conversation with Marvel is inadmissible hearsay.[95]  Additionally, Adams acknowledged that he was concerned

---

examine the record as a whole in determining causation.  Plaintiff argues that, upon learning that she was pregnant, her supervisor abandoned her.  To support her claim of abandonment, she maintains that the store was not properly staffed and there was inadequate security.  However, there is no evidence that defendant took, or failed to take, action because of plaintiff's pregnancy.") (emphasis added) (internal citations omitted).

[93] *See Brown v. Boeing Co.*, 468 F. Supp. 2d 729, 737 (E.D. Pa. 2007) ("In her brief, [plaintiff] repeatedly cites to her own deposition testimony to support her argument that she felt she was being retaliated against by Diebler.  She provides no evidence for this point, though, aside from her own beliefs that she was being discriminated against.  'Although there is no rule of law that the testimony of a discrimination plaintiff standing alone can never make out a case of discrimination that could withstand a summary judgment motion, a plaintiff's *belief* alone that she is a victim of discrimination is not enough to meet her burden of proof.'") (emphasis in original) (citation omitted) (quoting *Mroczek v. Bethlehem Steel Corp.,* 126 F. Supp. 2d 379, 390 (E.D. Pa. 2001)).

[94] D.I. 41 at B25.

[95] D.I. 44 at 2 & 2 n.2.

about the "hostile work environment" notation, but testified that he only asked that Marvel contact Carbaugh to clarify the reason for that notation. He denied asking for that notation to be changed.[96] Moreover, Marvel submitted a declaration averring that Adams requested she contact Carbaugh "to get a better understanding of what was meant by 'hostile work environment'" and that "Adams never asked me to request the physician to change or in any way alter the certification or any statements on the certification."[97]

Next, Naber points to her testimony recounting that after submitting her FMLA request, Mueller told her "[j]ust because you're on FMLA doesn't mean you are on light duty, you still have to do the work," and that she was being "watched."[98] The court notes that Mueller's first statement accurately recites the fact that Naber's request for intermittent FMLA leave merely stated her need for time off from work to attend counseling and/or medical appointments; it did not indicate a need for "light duty" when Naber was at work.[99] Also, the first statement was made during a meeting with Naber, Mueller, and Marvel during which Naber received a verbal warning for failing to conduct a scheduled "Sensations" activity session on March 15, 2009 and the second statement was made later that afternoon.[100] Naber acknowledged that she did not perform the scheduled activity session. It was after Naber explained to Mueller her reasons for

---

[96] D.I. 41 at B42-B43; D.I. 45, Ex. I at 44:22-45:12.

[97] D.I. 45, Ex. 1. Marvel's call to Carbaugh was not returned; Adams, therefore, never received clarification on the notation. *Id.*, Ex. I at 44:22-45:12.

[98] D.I. 41 at B12, B24.

[99] D.I. 36, Ex. H. Naber testified that she did not know if she was on light duty. "Q. Okay. And then you have the statement . . . 'In addition Mueller told plaintiff just because plaintiff was on FMLA leave, the FMLA leave did not mean plaintiff was on light duty'; correct? A. Correct. Q. And you talked about that? A. Correct. Q. And you were not on light duty, that you were aware of; correct? A. I don't know." D.I. 41 at B27.

[100] D.I. 41 at B12, B24, B28.

failing to perform the activity session that Mueller told her she was not on light duty and had to do her work and later in the day that she was being "watched."[101]   The context in which those statements were made, therefore, indicate they were related to Naber's acknowledged failure to perform a scheduled activity session, not in response to her request for intermittent FMLA leave.

Finally, Naber contends that Silver Lake was on notice of her need for FMLA leave prior to her formal request on March 10, 2009.  She argues that notice occurred on February 26, 2009 when she indicated her desire to work a reduced schedule due to work-related stress during a meeting with Mueller and Marvel.  Naber argues that she experienced discriminatory treatment from both Mueller and Adams from that point on.  That discriminatory treatment includes her verbal discipline for wearing jeans and for failure to perform the Sensations activity session, as well as her termination for allegedly falsifying Resident A's record.  The court disagrees that Silver Lake was on notice of Naber's need for FMLA leave as of the February 26, 2009 meeting.

The evidence shows that during Mueller's six-week maternity leave, Naber felt she had more tasks to accomplish during her normal work day and that resulted in her complaining of being "exhausted" and "stressed out."[102]   The week Mueller returned from leave, Naber had a meeting with Mueller and Marvel during which she stated her need to "get away for a while" and expressed interest in a reduction in the number of hours she worked each week.[103]   On March 1, 2009, Naber submitted a request for four

---

[101] *Id.* at B12, B24.
[102] D.I. 35, Ex. A at 136:21-137:21, 152:18-154:9, 156:10-17.
[103] *Id.*, Ex. A at 158:22-159:2; D.I. 41 at B1.

18

days off later in the month, which was granted.[104]  The court agrees with Silver Lake that

Naber's request for a reduced schedule on February 26, 2009, due to being exhausted

from her extra workload during Mueller's absence, was insufficient to put Silver Lake on

notice that she was invoking her FMLA rights or that she had a serious health

condition.[105]  Therefore, March 10, 2009 is the date from which Silver Lake was on

notice of Naber's need for FMLA leave and her verbal warning for failing to conduct the

Sensations activity and her termination are Silver Lake's actions relevant to her FMLA

retaliation claim.[106]

With regard to the verbal warning Naber received for failing to conduct the

Sensations activity session, Naber offered several excuses for not having conducted the

session, including that she was the only Recreation Assistant on duty that day, that she

had been very busy earlier in the day, and that she was outside with a resident at the

time the session was to have begun.[107]  She also suggested that Mueller, who was the

---

[104] D.I. 35, Ex. A at 160:18-162:5, *id.*, Ex. E.

[105] *See, e.g., Collins v. NTN-Bower Corp.*, 272 F.3d 1006, 1008 (7th Cir. 2001) (affirming dismissal of FMLA claim because "'[s]ick' does not imply 'a serious health condition'" and "employers . . . are entitled to the sort of notice that will inform them not only that the FMLA may apply but also when a given employee will return to work"); *Beaver v. RGIS Inventory Specialists, Inc.*, 144 Fed. Appx. 452, 456-57 (6th Cir. 2005) (holding that employee who informed her employer that she "didn't feel good," was "sick," and "needed a couple days to get better, a few days" was insufficient for employer to conclude that the employee needed FMLA leave).

[106] Even if the court were to consider Naber's discipline for wearing jeans as relevant to her FMLA retaliation claim, the evidence demonstrates that Adams and Mueller did not treat her differently from other employees that day.  Mueller testified that Naber was the only one of her supervised employees wearing jeans on the day in question.  D.I. 41 at B33-34.  Naber admitted that the other employees she saw wearing jeans that day were not supervised by Mueller and that she had no knowledge of whether those employees were disciplined.  The only employee Naber specifically identified as wearing jeans that day was a manager of social services who was not supervised by Mueller.  Naber testified Adams had informed her that he had written up that individual.  D.I. 35, Ex. A at 168:8-169:17.  Adams confirmed that the social services manager reported directly to him, that he issued her a verbal warning for a dress code violation, and that he sent her home to change clothes, unlike Naber who was not sent home that day.  *Id.*, Ex. I at 36:17-37:17; D.I. 41 at B34.  There is also no dispute that, according to Silver Lake's Employee Handbook, a verbal warning was the appropriate discipline for the first instance of failure to comply with the facility's dress code.  D.I. 35, Ex. B at DOVER0000250, # 17.

[107] D.I. 41 at B12.

manager on duty that day, could have conducted the session herself.[108]  Importantly,

however, Naber acknowledges that it was expected that she would conduct the session

and did not.[109]  She also does not argue, nor point to any evidence, that her discipline

was contrary to Silver Lake policy.  There is also no indication in the record that other

weekend employees failed to conduct scheduled activity sessions but were not

disciplined.  Consequently, this discipline of Naber does not support her allegation of

FMLA retaliation.[110]

Lastly, Naber argues that her termination for erroneously documenting a one-on-

one session with Resident A is evidence of retaliation based on evidence that other

employees, and Naber herself early in her employment, had not been disciplined for

---

[108] *Id.* at B27.  Mueller testified that she did not conduct the Sensations activity session herself because, as the manager on duty "you have a number of other job responsibilities outside of your normal job responsibilities.  And that was [Naber's] responsibility for that day.  That was part of the responsibility for the weekend person.  So I chose to give her the opportunity to go back and do that group, which did not happen."  *Id.* at B35.

[109] *Id.* at B27-B28 ("Q.  Were you expected to have put on a sensations group?  Was that the anticipation for the day?  A.  I believe so.  I'm not sure."  "Q.  And [Mueller] wrote you up saying it was your job to do it?  A.  Correct. . . .  Q.  And you didn't do it?  A.  Yes.").

[110] *See, e.g., Walsifer v. Borough of Belmar*, Civ. No. 04-5393(DRD), 2006 U.S. Dist. LEXIS 75601, at *18, *27-*28 (D.N.J. Oct. 12, 2006) (The plaintiff alleged retaliation for asserting First Amendment rights.  The court's opinion recites that "Plaintiff argues that the Internal Affairs investigation permits an inference that Defendants' actions were politically motivated.  However, Plaintiff has not produced any evidence that Plaintiff did not in fact commit the offense.  Because Plaintiff's actions warranted discipline, as demonstrated by the findings of the arbitrator, Plaintiff's argument that the discipline is evidence of discriminatory intent is without merit."); *Alvarado v. FedEx Corp.*, No. C 04-00098 SI, 2006 U.S. Dist. LEXIS 9982, at *4, *18 (N.D. Cal. Mar. 10, 2006) (The plaintiff brought claims for disparate impact and disparate treatment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e.  The court concluded that a disciplinary action was not shown to be discriminatory where the plaintiff did "not dispute making comments for which he was disciplined, nor has he submitted any evidence that non-minority employees have engaged in similar behavior without being disciplined."  With regard to other disciplinary actions, the plaintiff did not submit "any evidence to suggest that the disciplinary actions taken were discriminatory, nor does he dispute that he was in violation of those rules."); *cf. Miller v. Aramark Healthcare Support Services*, 555 F. Supp. 2d 463, 470-71 (D. Del. 2008), cited by Naber, where the court stated that "[a]lthough timing alone does not give rise to an inference of retaliation, the record as a whole shows that plaintiff *was never disciplined prior to his return from medical leave*.  Within a month and a half after his return to full-time status, plaintiff was written up several times and ultimately terminated for his alleged failure to comply with safety standards.  There is evidence that discrimination may have been a factor in the adverse employment action since other [similarly situated employees] *were not disciplined for similar infractions*." (emphasis added).

similar resident documentation errors.  As noted above, early in her employment Naber had recorded a one-on-one room visit with a particular resident when, in fact, she had visited a different resident.  Mueller did not discipline Naber and merely told her to be more careful.[111]  Shoup had also made documentation errors regarding residents, but was not disciplined for doing so.[112]  Additionally, employee Stephanie Hrenchrir ("Hrenchrir") had transported the wrong patients to doctors' appointments and was not disciplined for doing so.[113]

Naber's previous documentation error, which she acknowledges was "early in her employment," was that she wrote having done a one-on-one visit with a particular resident when the visit was with another resident.[114]  Shoup's errors purportedly involved incorrectly recording the date of an activity that she actually provided to a resident.  As an example, Shoup was allegedly permitted to correct, without being disciplined, her documentation of a resident having an activity on Tuesday, when the activity actually took place on Monday.[115]  Neither of those documentation errors recorded providing an activity to a resident not at Silver Lake and Naber did not know of Shoup ever documenting an activity with a resident who was not physically in the building or documenting an activity that, in fact, never took place.[116]  Shoup, therefore, is not a proper comparator for the discipline faced by Naber for documenting a visit with a

---

[111] D.I. 41 at B28-B29.
[112] Naber testified that Shoup had made documentation errors on the activity log books and when that happened, "[Shoup] had the opportunity to cross it out and put error after she acknowledged that she made a mistake . . . ."  D.I. 35, Ex. A at 258:6-25.
[113] D.I. 41 at B47-B48 (Defendant's Responses to Plaintiff's Request for Admissions).
[114] *Id.* at B28-B29.
[115] D.I. 35, Ex. A at 259:7-260:4.
[116] *Id.*, Ex. A at 259:4-260:8.

patient who was not present at the facility.  With regard to Hrenchir, there is no evidence when her transportation mistakes took place or that she was supervised by Mueller. Furthermore, transporting residents to doctors' appointments is different conduct than documenting resident activities.  As a result she is not a similarly situated employee to Naber and is also an improper comparator.[117]

There is no dispute that Naber documented providing an activity to Resident A when he was not at Silver Lake.  Naber admitted this fact at deposition.  She merely asserted that she did not intentionally falsify Resident A's record.

> Q.  The resident in question here is [Resident A]; correct?
> A.  Correct.
> Q.  And you documented that you had provided some type of activity to [Resident A] on March 29th; correct?
> A.  Correct.
> Q.  And you did not provide service to [Resident A] on March 29th?
> A.  That I know of, no.
> Q.  So you're not saying that you didn't do this–
> A.  Right.
> Q.  –your statement is you didn't intentionally document something?
> A.  Right.  Correct.[118]

It is also undisputed that according to Silver Lake's Employee Handbook, immediate termination is the sanction for the first offense of falsifying a resident's records,[119] and that Naber knew that was the company's policy.[120]  Based on the above, Naber's does not set forth a prima facie case of FMLA retaliation for failure to establish a causal

---

[117] *See Mihalko v. Potter*, 2003 U.S. Dist. LEXIS 24825, at *22 (W.D. Pa. Dec. 12, 2003) (stating that a "similarly situated" employee "must have dealt with the same supervisor, have been subject to the same standards[,] and have engaged in the same conduct without such differentiating [or] mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it") (first alteration in original) (internal quotation marks omitted).

[118] D.I. 35, Ex. A at 240:17-241:8.

[119] *Id.*, Ex. B at DOVER0000251, #18.

[120] *Id.*, Ex. A at 326:18-23.

connection between her notifying Silver Lake of her need to take intermittent FMLA leave and her termination.[121]  Even if she were to have established a prima facie case, summary judgment would nevertheless be warranted because, as discussed below, she cannot establish that Silver Lake's legitimate, non-discriminatory reason for her termination was pretextual.

In order to rebut Silver Lake's legitimate, non-discriminatory reason for Naber's termination, she must submit evidence from which "a fact finder could reasonably either (1) disbelieve [Silver Lake's] articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of [Silver Lake's] action."[122]

To discredit Silver Lake's proffered reason for Naber's termination, she must demonstrate "'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Silver Lake's] proffered legitimate reason for its action that a reasonable fact finder could rationally find them unworthy of credence.'"[123]  Naber must show "not merely that [Silver Lake's] proffered reason was wrong, but that it was so plainly wrong that it cannot have been the real reason."[124]

Silver Lake insists that Naber cannot meet that burden because she conceded that she documented providing an activity to Resident A when he was not at the

---

[121] *See, e.g., Weiler v. R&T Mechanical, Inc.*, 255 Fed. Appx. 665, 669 (3d Cir. 2007) (finding that the plaintiff's job abandonment was a "crucial intervening fact [that] broke the causal chain" between the plaintiff's protected conduct his termination, which termination "was in accordance with R&T's Employee Handbook" providing for "immediate discharge" for the plaintiff's unauthorized absence from work).

[122] *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).

[123] *Keller v. Orix Credit Alliance*, 130 F.3d 1101, 1108-09 (3d Cir. 1997) (quoting *Fuentes*, 32 F.3d at 765).

[124] *Id.* at 1109.

facility[125] and that other evidence supports Adams's determination that Naber falsified Resident A's record.

Naber strenuously denies Silver Lake's assertion that she admitted to the conduct for which she was terminated; falsifying records. Although Naber did not specifically state that she made a mistake or confused her residents when meeting with Adams,[126] she repeatedly told him that she had seen an African-American man in Resident A's room and had read to him.[127] Also, while Naber told Adams she knew her residents, her testimony is that she was not familiar with Resident A.[128] Naber points out that Resident A was known to be nonverbal,[129] therefore, she would not have expected him to respond when she addressed him by name. Naber also contends that Adams was aware that the only thing she knew about Resident A was that he was African-American, but Adams did not ask Naber about other physical characteristics of Resident A so that he could verify whether the individual she saw might have been another resident.[130] Naber also notes her opinion that Residents B and C, whose records she was also accused of falsifying, were cognitively impaired.[131]

Naber contends, therefore, that there is ample evidence from which Adams could have concluded that her error was a case of mistaken identity and a jury could disbelieve Silver Lake's proffered reason for her termination and find that reason

---

[125] D.I. 35, Ex. A at 240:17-241:8.
[126] *Id.*, Ex. A at 298:2-299:6.
[127] *Id.*, Ex. A at 293:8-14.
[128] *Id.*, Ex. A at 293:23-294:8; D.I. 41 at B19.
[129] D.I. 41 at B37.
[130] D.I. 35, Ex. I at 57:6-58:4.
[131] D.I. 41 at B18 (Naber testifying that she believed those residents had cognitive impairment and that one of them "has on similar occasions said that bugs and spiders come out of her bed.").

pretextual.  As support for that contention, she argues there was no logical reason for her to falsify her interaction with Resident A because:  (1) she was not required to conduct the activity, (2) she was merely helping Shoup out by conducting the activity, (3) she did not receive extra pay for conducting the activity, and (4) she could have simply relaxed instead of conducting the activity with the residents that afternoon.[132]  Lastly, Naber reiterates her argument that she and Shoup had previously made documentation errors regarding providing services to patients and had not been disciplined for them and that Hrenchrir transported the wrong residents to doctors' appointments without being disciplined.

As noted above, Shoup and Hrenchrir are not proper comparators.  That they were not disciplined for their cited errors does not advance Naber's case.  Also, whether Adams's decision to terminate Naber was illogical, or even wrong, is not dispositive because "the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is 'wise, shrewd, prudent or competent.'"[133]  As a result, her assertion that the documentation at issue was possibly the result of mistaken identity does not rebut Silver Lake's legitimate, non-discriminatory reason for her

---

[132] *Id.* at B36-B37.

[133] *Fuentes*, 32 F.3d at 765; *see also Billet v. CIGNA Corp.*, 940 F.2d 812, 825 (3d Cir. 1991) ("What matters is the perception of the decision maker.") *overruled in part on other grounds by St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993); *Keller*, 130 F.3d at 1109 ("The question is not whether the employer made the best or even a sound business decision; it is whether the real reason is discrimination."); *Braithwaite v. Accupac, Inc.*, No. 00-5405, 2002 WL 31928434, at *6 (E.D. Pa. Dec. 30, 2002) ("That plaintiff may believe he was unfairly blamed for the deficiencies in his area does not establish pretext as it is the employer's belief that is important.").  Silver Lake points out that there is no evidence in the record that the fact Naber was not required to provide an activity to Resident A on the date in question was a fact developed during Adams's investigation or otherwise known to him.  *See* D.I. 41 at B36-B37 (Mueller testifying that she (Mueller) was the one who suggested to Resident Assistants working on Sundays that, if time permitted, they could perform individual resident activities scheduled for the following Monday).

termination.[134]

It is improper for the court to second guess Adams's business judgement or decision-making process, or make an independent assessment of his decision.[135] It is the perception of the decisionmaker, Adams, at the time he decided to terminate Naber that is key.[136] Silver Lake relies on the following evidence available to Adams at that time to support his proffered reason for his determination that Naber falsified records.

First, Naber, a full time employee of Silver Lake for a year and a half, reported on March 29, 2009 that she had conducted an activity with Resident A when that was impossible as he was in the hospital on that date.[137] That discrepancy led Adams to begin an investigation, including instructing Mueller to interview other cognitively aware residents Naber documented as having an activity with on March 29, 2009.[138]

---

[134] *See, e.g., Garvin v. Progressive Cas. Ins. Co.*, No. 5:08-cv-3758, 2010 WL 1948593, at *7 (E.D. Pa. May 10, 2010) ("Plaintiff also asserts that he did not intentionally falsify the expense report, but claims it was a mistake. This argument also fails because Plaintiff's state of mind is irrelevant–it is the state of mind of the decisionmaker that matters in terms of pretext. Furthermore, even if Plaintiff did make an honest mistake . . . an employer can make a 'bad' decision to terminate an employee as long as the 'bad' decision is not based on a disability.") (internal citation omitted) (citing *Keller*, 130 F.3d at 1108-09).

[135] *Kautz. v. Met-Pro Corp.*, 412 F.3d 463, 468 (3d Cir. 2005) ("An employer may not use evaluating criteria which lacks any relationship at all to the performance of the employee being evaluated because to do so would be inconsistent with and contradictory to the employer's stated purpose. *Absent this type of violation* of the *Fuentes* standard, we *will not second guess the method an employer uses to evaluate its employees.*") (emphasis added) (internal citation omitted); *Healy v. New York Life Ins. Co.*, 860 F.2d 1209,1216 (3d Cir. 1988) ("[O]ur inquiry must concern pretext, and not an independent assessment of how we might evaluate and treat a loyal employee."); *Logue v. Int'l Rehab. Assocs., Inc.*, 837 F.2d 150, 155 n.5 (3d Cir. 1988) ([O]ur task is not to assess the overall fairness of [the] . . . employer's actions.").

[136] *Garvin*, 2010 WL 1948593, at *7 ("The only inquiry is whether the decisionmaker . . . *at the time of his decision*, honestly believed that Plaintiff had violated the company's policy at issue. Here, the record establishes that [the decisionmaker] had reviewed information relevant to the investigation on the falsified expense report and that he based his decision on that information.") (emphasis added) (citation omitted).

[137] D.I. 35, Ex. D at 96:9-97:12; *id.*, Ex. I at 51:12-24; *id.*, Ex. A at 240:17-241:2.

[138] D.I. 41 at B44 (Adams testified that he knew "not all of [the residents] are going to be able to tell you [whether Naber visited them]. So I asked [Mueller] . . . to go out and talk to these residents, if they are vocal, if they can communicate, and find out if [Naber] saw these residents . . . ."); D.I. 35, Ex. I at 52:9-15 (Adams testified that Mueller had looked at the list of residents Naber had documented as visiting that day and "[t]here were some residents on that that [were] cognitively impaired or in a state that they

Residents B and C, whom Naber documented as visiting on that date, told Mueller Naber had not provided the documented activities; Mueller provided signed statements to Adams reflecting those residents' responses.[139]  During her March 31, 2009 meeting with Adams and Krauss, Naber correctly described Residents A, B, and C, their rooms, and their roommates.[140]  Naber provided details of her interactions with those residents, including that she read to Resident A.[141]  When informed that Residents B and C denied Naber had conducted the documented activities with them, and that Resident A was in the hospital, Naber insisted she knew each of her residents and that she had conducted the activities she recorded for March 29, 2009.[142]  During this meeting, Naber did not suggest to Adams that Residents B and C were cognitively impaired as a reason they might not had remembered seeing her that day.[143]  In response to being informed that Resident A was in the hospital on the date she recorded and activity with him, Naber told Adams that "he must have c[o]me back then."[144]  During the meeting, Naber did not

---

couldn't communicate, so they wouldn't be able to tell her one way or another."); *id.*, Ex. D at 98:10-23 (Mueller testified that on Adams's instruction "I . . . chose two residents that I felt were cognitively aware enough to know if [Naber] had had a visit the previous day and spoke with them.").  Both Adams and Mueller testified that the purpose of the investigation was to determine whether Naber's documentation of an activity with Resident A was merely a mistake.  D.I. 41 at B44 (Adams testified that he asked Mueller to review the residents' records "to see if by chance there is another gentleman on here that she got it confused with somebody, if she signed off on another gentleman's name . . . .  I asked [Mueller] to go back and look at that list and verify that [Naber] was in there and saw all of those residents, that there wasn't some kind of confusion or something, that it was an understandable mistake."); D.I. 35, Ex. D at 98:11-16 (Mueller similarly testified that "[Adams] asked me to compare all of the one-on-ones, the individual intervention notes that [Naber] had done for that day to see if maybe she wrote it on this person and it shouldn't have been, you know, to make sure there wasn't just like a transcription error and to look into other visits she had don't that day.").

[139] D.I. 35, Ex. D at 98:21-99:11; *id.*, Ex. I at 52:5-53:1; *id.*, Ex. D at 54:12-13; D.I. 41 at B36; *id.* at B14.

[140] D.I. 35, Ex. I at 55:20-58:14; *id.*, Ex. A at 292:8-293:14.

[141] *Id.*, Ex. A at 292:8-293:14; *id.*, Ex. I at 55:20-58:14, 59:18-24.

[142] *Id.*, Ex. A at 292:8-293:14, 296:18-297:4, *id.*, Ex. I at 58:24-59:24.

[143] *Id.*, Ex. A at 292:20-24.  Naber's testimony that she believed Residents B and C were cognitively impaired was given at her unemployment hearing on June 18, 2009, over two and a half months after her termination.  D. I. 41 at B18.

[144] D.I. 35, Ex. A at 294:9-17.

suggest to Adams that she had confused her residents or read to another resident who happened to be in Resident A's room.[145] Despite being told by Krauss at the end of the meeting to call her if Naber had any additional information she wanted to share, Naber did not call Krauss or Adams with any such information prior to her termination.[146]

Based on the foregoing, Silver Lake contends that Naber cannot discredit Adams's reason for her termination. The court agrees. Based on the record evidence, the court holds that a reasonable jury could not disbelieve Silver Lake's legitimate non-discriminatory reason for terminating Naber, or find that an invidious discriminatory reason was more likely than not a motivating or determinative cause for her termination. Upon learning of the documentation error for Resident A, Adams began an investigation to determine whether that documentation was merely a mistake. He determined that it was not. The evidence available to him at the time he made this conclusion, whether he was correct or not, is sufficient to counter Naber's pretextual argument. Under such circumstances, the court will not question the wisdom of that conclusion.[147] Consequently, Silver Lake's motion for summary judgment on Naber's FMLA retaliation claim is granted.

### D.  ADA Discrimination Claim

---

[145] *Id.*, Ex. A at 298:2-299:6.

[146] *Id.*, Ex. I at 61:1-8, D.I. 41 at B46.

[147] *Hicks v. Arthur*, 878 F. Supp. 737, 739 (E.D. Pa. 1995) (that a decision is ill-informed or ill-considered does not make it pretextual), *aff'd* 72 F.3d 122 (3d Cir. 1995); *see also Parker v. Verizon Pennsylvania, Inc.*, 309 Fed. Appx. 551, 563 (3d Cir. 2009) (citing the holding of *Connel v. Hallmark Cards, Inc.*, 2002 WL 1461969, at *2 (D. Kan. June 19, 2002), when considering an FMLA interference claim, that an "employer who discharges employee based on reasonable and honest belief that employee has been dishonest would not be in violation of the FMLA even if its conclusion is mistaken"); *id.* ("Regardless of [plaintiff's] denial that he actually misrepresented his health condition, [the employer's] honest suspicion that [plaintiff] misused his leave prevents it from being found liable for violating the FMLA; [plaintiff] was not entitled to the right or reinstatement if [the employer] honestly believed that he was not using FMLA leave for the intended purpose.").

Naber's ADA discrimination claim is also governed by the *McDonnell Douglas* burden-shifting analysis.  Silver Lake argues that Naber can not establish a prima facie case to support her disability discrimination claim.  To establish a prima facie case of unlawful discrimination under the ADA, Naber must demonstrate that she:  "(1) has a disability; (2) is a qualified individual; and (3) has suffered an adverse employment action because of that disability."[148]  Silver Lake contends that her disability discrimination claim fails at the prima facie stage because she is not disabled.  To qualify as disabled under the act, Naber must:  (1) have a physical or mental impairment that substantially limits one or more major life activities; (2) have a record of such impairment; or (3) be regarded as having such an impairment.[149]  Silver Lake contends that Naber's alleged depression does not satisfy any of those categories.  Major life activities "include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, *sleeping*, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."[150]  To be substantially limited means being (1) "[u]nable to perform a major life activity that the average person in the general population can perform" or (2) "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life

---

[148] *Maynard v. Goodwill Indus. of Del. and Del. County, Inc.*, 678 F. Supp. 2d 243, 255 (D. Del. 2010) (citing *Turner v. Hershey Chocolate USA*, 440 F.3d 604, 611 (3d Cir. 2006)).

[149] 42 U.S.C. § 12102(1)(A)-(C) (2009).

[150] 42 U.S.C. § 12102(2)(A) (2009) (emphasis added); *see also* 29 C.F.R. § 1630.2(i) (defining major life activities as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, breathing, learning, and working.").

activity."[151]  In determining whether an individual is substantially limited in a major life activity, consideration must be given to:  (1) "[t]he nature and severity of the impairment;" (2) "[t]he duration or expected duration of the impairment;" and, (3) "[t]he permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment."[152]  "An impairment that substantially limits one major life activity need not limit other major life activities in order to be considered a disability."[153] The act also states that "[t]he definition of disability . . . shall be construed in favor of broad coverage of individuals under this chapter . . . ."[154]

Silver Lake contends that Naber does not have any physical or mental impairment that substantially limits any of her major life activities.  At deposition, Naber stated her depression limited her ability to sleep, eat, and concentrate.[155]  Silver Lake contends her testimony contradicts this assertion.  With regard to eating, Naber testified that she does eat every day:  "I don't starve myself."[156]  She stated that her difficultly concentrating was associated with sleeplessness:  "[w]hen I can't sleep, it's really hard to stay concentrated, to focus."[157]  She stated that she "can't sleep sometimes."[158] When asked about sleeping, she testified that she was able to sleep and that "[a]t the beginning" she sometimes took over-the-counter Tylenol PM to help her sleep and that

---

[151] 29 C.F.R. § 1630.2(j)(1)(i)-(ii).
[152] 29 C.F.R. § 1630.2(j)(2)(i)-(iii).
[153] 42 U.S.C. § 12102(4)(C).
[154] 42 U.S.C. § 12102(4)(A).
[155] D.I. 35, Ex. A at 127:19-128:2, 129:10-22.
[156] *Id.*, Ex. A at 128:18-22; *id.*, Ex. A at 228:14-22 (stating that her eating was affected but that she did not stop eating altogether).
[157] *Id.*, Ex. A at 129:21-22; *id.*, Ex. A at 228:4-13 ("Q.  Can you tell me anything more about how your concentration level was affected by your mental health issues?  A.  I was always thinking about what happened . . . with my employment and what happened with–what the events–what took place.  Uhm, very upset.").
[158] *Id.*, Ex. A at 127:21-22.

currently she only takes that product "[e]very now and then."[159]  Prior to her termination,

she was unable to sleep at all "once or twice a week."[160]  When asked how often she is

currently unable to sleep, she replied, "[i]t really depends.  If I really start thinking about

certain things . . . I won't get that much sleep at all a couple nights a week.  I try to . . .

do my exercises, what my therapist said, and sometimes I can go to sleep."[161]  Silver

Lake also maintains that the record demonstrates Naber's purported difficulty

concentrating was not substantially limiting.  Except for leaving work for weekly

counseling sessions, there is no evidence she unable to work her regular schedule.

Silver Lake argues Naber's testimony that she "was always thinking about what

happened"[162] demonstrates that it was her termination, not her alleged disability, that

affected her concentration.  Silver Lake also notes that Naber was able to spend time

with friends (going shopping and out to dinner) and traveled to Florida two or three

times a year to visit with family[163] as evidence that her depression was not disabling.

Additionally, Silver Lake contends that her disability claim is flawed because, at

best, Naber's condition was of limited duration and was entirely related to her strained

relationship with Mueller.  Silver Lake states that courts consistently find such conditions

do not qualify as disabilities.[164]

---

[159] *Id.*, Ex. A at 128:23-129:9.

[160] *Id.*, Ex. A at 133:12-25.

[161] *Id.*, Ex. A at 132:21-133:3.  The "certain things" that disturb her sleep she was referencing were the circumstances surrounding her termination.  *Id.* at 133:4-11.

[162] *Id.*, Ex. A at 228:3-13.

[163] *Id.*, Ex. A at 129:24-131:18.

[164] D.I. 33 at 11-12 (citing *McDonald v. Pennsylvania*, 62 F.3d 92, 95 (3d Cir. 1995) (holding that an impairment of limited duration is not a disability within the meaning of the statute); *Ashton v. American Telephone and Telegram Company*, 225 Fed. Appx. 61, 66-67 (3d Cir. 2007) (holding that the plaintiff was not disabled where her impairment "appeared to be situational, triggered by her worsening relationship with her supervisor")).

Silver Lake argues the Third Circuit's ruling in *Maslanka v. Johnson & Johnson, Inc.*[165] presents allegations analogous to Naber's. There, the plaintiff was diagnosed as "suffering from significant anxiety disorder and major depression associated with his stressful work situation" stemming from increasingly negative reviews from his supervisor.[166] Claiming discrimination under the ADA, the plaintiff "alleged he was disabled by generalized anxiety and depression, which substantially limited the major life activities of sleeping, concentrating, and working."[167] The defendant moved for summary judgment arguing that the plaintiff's disability claim under the ADA failed for lack of sufficient evidence that he was impaired by anxiety or depression; that the alleged impairment was temporary; and, that his impairment did not substantially limit a major life activity.[168] The district court granted summary judgment in favor of the defendant and held that, although the plaintiff had made out a prima facie case of impairment, he did not demonstrate that his impairment substantially limited his major life activities of cognitive function, sleeping, or working. Consequently, the court found that, as a matter of law, he was not "disabled" under the ADA.[169]

On appeal, the Third Circuit noted that the plaintiff's medical records reported that his anxiety and depression were expected to last only as long as he worked for the same supervisor or continued to receive negative reviews. The plaintiff testified that his sleeping problems only lasted approximately three days and his cognitive function was not substantially limited as evidenced by his contention that his work performance met

---

[165] 305 Fed. Appx. 848 (3d Cir. 2008).
[166] *Id.* at 849-50.
[167] *Id.* at 851.
[168] *Id.*
[169] *Id.*

or exceeded the company's expectations during the relevant time periods. The plaintiff's ability to work was also not substantially limited as medical evidence was provided that he could perform his job under a different supervisor and, therefore, could perform the same job for a different employer. Indeed, he was recruited to work for another company shortly after his termination with the defendant, demonstrating that his impairment did not result in negative long-term or permanent impact. Based on the above, the Third Circuit stated that "[n]o reasonable juror could conclude from the record evidence that [the plaintiff's] impairment was permanent or would have a long-term impact."[170]

Silver Lake argues that Naber's discrimination claim similarly fails because her alleged anxiety and depression stem exclusively from her strained relationship with Mueller and were of a temporary nature only.[171] Silver Lake maintains that there is no evidence in the record that Naber suffered any negative long-term or permanent impact from her impairment. Silver Lake contends that Naber's testimony confirms that her alleged depression is temporary and that her condition has already improved.[172] At the

---

[170] *Id.* at 852.

[171] D.I. 35, Ex. A at 147:3-16 ("Q. Why do you think that you were on FMLA? A. Because I was dealing with a lot of stress and I needed to work on dealing with my issues. Q. Okay. And what was causing the stress? A. Stress at work. Q. Stress at work? A. Yes. Q. Any other stress in your life at the time? A. Not that I'm aware of. At that time, no."); *id.*, Ex. A at 148:13-22 ("Q. So the only thing, then, at this time frame, . . . March of 2009, the only thing causing stress in your life was work? A. Work, correct. Q. Okay. And that's why you went out on FMLA? A. Correct. Q. To handle the stress? A. Correct.").

[172] *Id.*, Ex. A at 230:7-231:7 ("Q. All right. So then it asks if your disability was permanent or temporary, and you said temporary. A. Uh-huh. Q. Why do you say temporary? A. Because . . . I will get better eventually. It's just working through the issues, I guess. Q. So why do you feel–did a doctor tell you that you're going to get better? A. No. Q. You just feel that you will get better? A. Eventually, in time. Q. What do you think will help you? A. I don't know. I don't know. I don't know. To work through my problems, to– I don't know. I don't know. Q. Okay. But you feel that this is not going to be the rest of your life? A. I believe."); *id.*, Ex. A at 231:10-18 (On a document Naber filled out on May 20, 2009, in answer to whether her "disability is worsening, improving or generally remaining the same," she wrote, "I am currently seeing a counselor at the mental health facility for the state. I feel like I am slowly

time of her deposition, she did not know if she had a current diagnosis of depression.[173]
Silver Lake argues, therefore, that Naber's claim mirrors that of the plaintiff in *Maslanka,*
and likewise fails.

In opposition to Silver Lake's motion, Naber argues that the primary problem in
Silver Lake's argument that Naber does not qualify as disabled is that it relies on cases
decided before January 1, 2009. On September 25, 2008, the ADA Amendments Act of
2008 ("ADAAA") was enacted in order "[t]o restore the intent and protections of the
Americans with Disabilities Act of 1990,"[174] and took effect January 1, 2009. As noted
above, the ADAAA provides that the definition of disability "shall be construed in favor of
broad coverage of individuals . . . ."[175] Silver Lake correctly notes, however, that the
passage of the ADAAA did not relieve Naber of proving that her alleged impairment
"substantially limits" her ability to sleep. Silver Lake reiterates that to proceed with her
disability claim, Naber must establish (1) that her alleged depression, and not some
other factor, caused her occasional inability to sleep and (2) that her ability to sleep was
substantially limited.

Naber focuses on her experience of getting no sleep one or two nights per week,
rather than her concentration or eating habits, as constituting a substantial limitation on
the major life activity of sleeping. Naber also contends that Silver Lake has no

---

improving.").
[173] *Id.*, Ex. A at 122:6-8 ("Q. Do you know if you still have a current diagnosis of depression? A. I
do not know."); *see also id.*, Ex. A at 197:12-198:5 ("Q. Do you believe that you have a serious health
condition today? A. Uhm, I don't know. Q. Did you believe that you had a serious health condition in
March 2009? A. Yes. Q. Okay. What was that? A. Uhm, depression. Q. Okay. And that was
Maryellen Carbaugh's diagnosis? A. Uhm, yes. Q. Okay. Was your depression diagnosed as temporary
or permanent, do you know? A. I don't know. Q. But you're not getting any treatment today? A. No.").
[174] Pub. L. No. 110-325, 122 Stat. 3553 (2008).
[175] 42 U.S.C. § 12102(4)(A).

evidence, and no expert testimony, that plaintiff's condition was "of limited duration" and "stemmed entirely from her strained relationship with her supervisor."  Unlike the plaintiff in *Maslanka* whose sleeping problems lasted only three days, Naber testified that, prior to her termination, she was unable to sleep at all one or two nights a week and that, currently, she is still unable to sleep at all "a couple nights a week."[176]  She disputes Silver Lake's assertion that her deposition testimony demonstrates that her condition is "temporary."  Rather, that testimony represents her hope that she "will get better . . . [e]ventually, in time" and that "this is not going to be the rest of [her] life."[177]

The evidence shows that before her termination Naber was unable to sleep at least one or two nights a week and that condition had persisted at least until her June 15, 2010 deposition, indicating that her condition was not of limited duration.  The persistence of that condition also casts doubt on Silver Lake's contention that her condition was entirely related to her strained relationship with Mueller.  Viewing the facts and drawing all reasonable inferences in favor of Naber, the court finds that there is a question of fact as to whether Naber's previously-diagnosed depression is the cause of her inability to sleep one or two nights a week and whether that sleeplessness is substantially limiting as compared to the average person in the general population.  Consequently, summary judgment cannot be granted on her ADA discrimination claim for failure to set forth a prima facie case that she is disabled.  Because, however, as discussed above, Naber cannot show that Silver Lake's legitimate, non-discriminatory reason for her termination is pretextual, her claim nevertheless fails.  As a result, Silver

---

[176] D.I. 35, Ex. A at 133:12-25,132:21-133:3.
[177] *Id.*, Ex. A at 230:7-231:7.

Lake's motion for summary judgment on Naber's ADA discrimination claims is granted.

### E.     FMLA Interference Claim

Silver Lake states that Naber also alleges that it interfered with her FMLA rights.

To properly set forth an interference claim:

> "[T]he employee only needs to show that he was entitled to benefits under the FMLA and that he was denied them." *Callison v. City of Philadelphia*, 430 F.3d 117, 119 (3d Cir. 2005) (citing 29 U.S.C. §§ 2612(a), 2614(a)). "Under this theory, the employee need not show that he was treated differently than others[, and] the employer cannot justify its actions by establishing a legitimate business purpose for its decision." *Id.* at 119-120. "An interference action is not about discrimination, it is only about whether the employer provided the employee with the entitlements guaranteed by the FMLA." *Id.* at 120. Because the FMLA is not about discrimination, a *McDonnell-Douglas* burden-shifting analysis is not required. *See Parker v. Hanhemann Univ. Hosp.*, 234 F. Supp. 2d 478, 485 (D.N.J.2002) (citing *Hodgens v. Gen'l Dynamics Corp.*, 144 F.3d 151, 159 (1st Cir.1998)).[178]

Naber acknowledges that she received the FMLA leave–and additional time

off–she requested.[179]  Silver Lake argues since Naber was never denied benefits to

which she was entitled under the FMLA, any claim based on interference with FMLA

---

[178] *Sommer v. The Vanguard Group*, 461 F.3d 397, 399 (3d Cir. 2006) (alteration in original); *see also Weisman v. Buckingham Tp.*, No. Civ. A. 04-CV-4719, 2005 WL 1406026, at *4 (E.D. Pa. June 14, 2005) ("Under an interference claim, it is the plaintiff's burden to show (1) she is an eligible employee under the FMLA, (2) defendant is an employer subject to the requirements of the FMLA, (3) she was entitled to leave under the FMLA, (4) she gave notice to the defendant of her intention to take FMLA leave, and (5) the defendant denied her the benefits to which she was entitled under the FMLA. Interference claims are not about discrimination; the issue is simply whether the employer provided its employee the entitlements set forth in the FMLA such as a twelve week leave or reinstatement after taking a medical leave. An interference claim also arises if an employee can demonstrate that his employer did not advise him of his rights under the FMLA and that this failure to advise rendered him unable to exercise his leave rights in a meaningful way thereby causing injury."); (internal citations omitted); *id.* (noting that "[t]he second type of recovery under the FMLA is the 'retaliation' theory" that is"analyzed under the burden shifting framework of *McDonnell Douglas Corp.*").

[179] D.I. 35, Ex. A at 221:19-222:22 (stating that she asked for, and received FMLA leave, and was granted the additional time off requested on March 1 and March 6, and does not remember ever being denied requested leave); D.I. 45, Ex. A at 160:18-162:5, 163:19-167:6 (stating that Mueller approved leave requested on March 1 and March 6 and that no requested vacation time was denied after February 2009); D.I. 35, Ex. E, Ex. G; D.I. 36, Ex. H.

rights necessarily fails.

Naber's complaint, under "Count II – FMLA," alleges that "Defendant . . . has *retaliated* against Plaintiff for her exercise of her rights under the FMLA and has *wrongfully interfered* with, restrained, and denied Plaintiff's exercise of her rights under the FMLA."[180] In her opposition brief, however, Naber did not respond to Silver Lake's argument in favor of summary judgment on a claim for interference with FMLA rights. Naber summarizes her opposition to Silver Lake's motion by asserting that summary judgment should be denied on her "*FMLA retaliation claims*" because the evidence of record could lead a fact finder to "reasonably either disbelieve [Silver Lake's] articulated reasons for [Naber's] termination or believe that an invidious reason was more likely than not a motivating cause of the termination."[181]

Because Naber failed to present evidence, or argument, demonstrating that Silver Lake interfered with her FMLA rights, the court grants summary judgment to Silver Lake to the extent Naber sought to put forth an FMLA interference claim.[182]

## IV.  CONCLUSION

---

[180] D.I. 1 at ¶ 28 (emphasis added); *see also id.* at ¶ 21 (alleging the reasons for Naber's termination were "discrimination against Plaintiff on the basis of her disability, retaliation against her for pursuing her rights under the FMLA, and *interference with the pursuit of her rights under the FMLA*") (emphasis added).

[181] D.I. 40 at 1-2 (emphasis added). Likewise, Naber asserts that summary judgement should be denied on her "ADA claims" both because Silver Lake purportedly bases its argument on "authority decided prior to amendment of the ADA" and that the "evidence establishes that [Naber] had a disability, that [Silver Lake's] proffered reasons for her termination were pretextual, and that [Silver Lake] discriminated against her on the basis of her disability." *Id.* at 2.

[182] *See, e.g., Di Giovanna v. Beth Israel Medical Center*, 651 F. Supp. 2d 193, 208 (S.D.N.Y. 2009) (granting summary judgment to defendants on plaintiff's claim that he was terminated because of his opposition to interference his FMLA rights and the FMLA rights of others where plaintiff "offered no evidence that he ever opposed any alleged interference with his or anyone else's FMLA rights," "made no attempt to rebut defendants' motion for summary judgment on this point," and did not mention the claim in his opposition papers).

For the reasons stated above, it is ORDERED, ADJUDGED, and DECREED, that defendant's motion for summary judgment (D.I. 32) is **GRANTED**.


February 24, 2011                                    /s/ Mary Pat Thynge
Wilmington, Delaware                                  UNITED STATES MAGISTRATE JUDGE